UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

THEENDA MARIE HUGHES                                                    PLAINTIFF

v.                                                    CIVIL ACTION NO. 3:02CV-60-S

CITY OF LOUISVILLE, et al.                                              DEFENDANTS

### MEMORANDUM OPINION

This matter is before the court for consideration of the following motions:

1.  The motion of the defendant, City of Louisville, for partial summary judgment (DN 123/134).

2.  The motion of the defendant, Greg Smith, for summary judgment (DN 123/134).

3.  The motion of the defendant, Angela Wiggins, for partial summary judgment (DN 123/134).

4.  The motion of the defendant, Ryan Nichols, for partial summary judgment (DN 125/127).

5.  The motion of the defendant, Robert Kaelin, for summary judgment (DN 128/130).

6.  The motion of the defendant, Charles E. Louden, for partial summary judgment (DN 131/133).[1]

The plaintiff, Theenda Marie Hughes, has brought suit under 42 U.S.C. §§ 1983 and 1985 alleging that she was improperly arrested, beaten, and later strip searched in front of a male arrestee. She alleges race-based discrimination, and violation her right to due process and equal protection (Count I).  She alleges policy, custom, practice and training failures by the police department (Counts II and V).  She alleges violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the Kentucky Constitution (Counts III and IV).

---

[1] These are the only remaining defendants in this case.  Other named defendants were dismissed by joint stipulation early in the litigation.  *See,* DN 8.

She has also alleged common law assault and battery (Count VI), false arrest/false imprisonment (Count VII), intentional infliction of emotional distress (Count VIII), malicious prosecution (Count [XI]),and invasion of privacy (Count [XII]).[2]

The parties are fairly consistent in identifying which facts are disputed and which are undisputed in this action.  The facts, as the parties have framed them, apply to the motions of all of the defendants, as do the well established principles of law governing civil rights actions in this Circuit.  The court will separately consider the application of the law to the facts with respect to each defendant in addressing the claims herein.

### I.  Claims not Subject to Summary Judgment

There are a number of claims which have been either partially or completely abandoned by the plaintiff.  There are also a number of claims for which summary judgment has not been sought.

In accordance with the statements in her memorandum and the tendered order accompanying it, Hughes has indicated her abandonment of any claims alleging violations of the Fifth, Eighth and Ninth Amendments.

All claims against Angela Wiggins are abandoned with the exception of the Fourth Amendment and invasion of privacy claims relating to the alleged illegal strip search of her person in the presence of her friend, Willie Pearson, at the police station.  Hughes does not specifically concede the state law invasion of privacy claim.  However, she offers no argument in opposition to the summary judgment motion apart from her contention that the strip search was not private and therefore was unconstitutional.  The state law invasion of privacy claim will therefore be dismissed. The Fourth Amendment claim relating to the strip search is addressed later in this opinion.

---

[2]It appears that the claims for malicious prosecution and invasion of privacy were misnumbered in the complaint.  There is no ninth or tenth claim.

Hughes does not dispute that defendant Greg Smith, former Chief of the Louisville Division of Police, can not be held vicariously liable for any state law torts of the officers who were under his command.

Hughes concedes that neither direct claims under the Kentucky Constitution nor claims for intentional infliction of emotional distress are viable herein.

We note also that the City of Louisville, Smith, Charles E. Louden, and Ryan Nichols do not dispute that genuine issues of material fact exist with respect to Hughes' Fourth Amendment claim for excessive force and illegal strip search. As such, they do not seek summary judgment as to these claims. Defendant Robert Kaelin, however, does seek summary judgment as to himself on the Fourth Amendment claims. His argument is addressed later in this opinion.

Additionally, the City, Smith, Louden, and Nichols do not seek summary judgment as to the state law claim for assault and battery (Count VI), as they concede the existence of a genuine issue of material fact concerning the arrest of Hughes. Kaelin has not separately discussed the claim for assault and battery in his motion for summary judgment, although he seeks summary judgment as to all claims against him. Hughes has not addressed the claim as alleged against Kaelin, but rather appears to include him in her conclusory statement that proof of excessive force will suffice to establish a battery under Kentucky law. This point is addressed later in the opinion.

## II. The Facts

On January 31, 2001 at approximately 10:30 or 11:00 p.m., an individual named Willie Pearson, an acquaintance of Hughes, picked Hughes up at her mother's home to take her to watch television at his home. (Hughes 6/23/04 Depo. ("Depo. I"), pp. 16-17). While at Pearson's apartment, Hughes consumed two glasses of Northern Light whiskey mixed with Coke. (Depo. I, p. 19). Pearson consumed "a couple of beers." (Depo. I, p. 20).

In the early morning hours, Hughes and Pearson left the apartment purportedly so that Pearson could take Hughes back to her mother's house.  At approximately 4:30 or 5:00 a.m., Officer Kaelin observed Pearson driving slowly down the street, as if the occupants of the vehicle may have been talking with someone on the street corner.  Kaelin slowed down and began watching the truck. (Kaelin depo., p. 8).  He noticed that Pearson did not have his rear license plate illuminated and decided to conduct a traffic stop at or near the corner of Wilson and Catalpa in the West End of Louisville.  (*Id.*).  When they saw flashing police lights, Pearson pulled the truck over to the side of the road.  (Depo. I, p. 25).  Hughes claims that both she and Pearson exited the truck, and that prior to getting out of the vehicle, she reached for and grabbed her purse.  (Depo. I, pp. 25, 35).

Officer Louden approached Hughes' side (the passenger side) and Officer Kaelin approached Pearson's side (the driver's side) of the truck.  (Depo. I, pp. 25, 36; Louden depo., p. 109; Kaelin depo., p. 8).  Officer Kaelin testified that he approached the vehicle and told Pearson to put his hands on the steering wheel.  He stated that Pearson appeared to be intoxicated and that he could smell the odor of alcohol.  (Kaelin depo., p. 8).  Officer Louden testified that as he approached the vehicle on Hughes' side, he observed her squirming around, making movements behind her back and looking to the driver's side at Officer Kaelin.  (Louden depo., p. 98).  He testified that she looked startled at seeing his presence on the passenger side of the vehicle.  He asked her for identification, but she did not have it with her.  (Kaelin depo., p. 109; Depo. I., p. 25).  He testified that at this point he got her out of the truck.  He stated that when she exited the vehicle he noticed a piece of crack rock the size of a pea, a crack pipe, a smaller pipe and a crack spoon in the seat where she had been sitting. (Louden Depo., pp. 109, 113).  Kaelin testified that when Louden was handcuffing Hughes, the vehicle door was open, he glanced in, and he saw a crack pipe and what appeared to be a crack rock on the seat.  (Kaelin depo., p. 10).  Hughes denies having possessed crack or drug paraphernalia on the occasion in question.  She claims that she did not see these items in the truck.  (Depo. I, p. 128).

- 4 -

Officer Nichols testified that he did not see any drugs or paraphernalia until he saw the items at the police station. (Trial Trans., Nichols, pp. 156-158).

Louden asked Hughes her name and she responded that her name was Theenda Hughes (Depo. I, pp. 27, 40). He ran a check and determined that there were no outstanding warrants for Hughes' arrest. (Depo. I, p. 27). By this time, Pearson had been placed in a police vehicle. (*Id.*). Officer Kaelin came over to Officer Louden and Hughes. The officers asked Hughes who sold drugs in the area and told her to "work with them," and they would "work with [her]." (*Id.*). When she responded that she did not know what they were talking about, the officers grabbed her elbows and began walking her down an alley. Hughes began screaming "somebody help me," and screaming for her mother. The officers then told her to "shut up" and brought her back to the police vehicle. (Depo. I, p. 28).

When they brought Hughes back to the police vehicle, they leaned her against the back passenger door, with her back against the door, and Hughes noticed a third officer, Officer Nichols, for the first time. He was standing in front of her, she was still screaming, Hughes alleges that Nichols grabbed Hughes' hair, pulling her wig off, and remarked "Damn, your hair is just as nappy as the wig." (Depo. I, pp. 28-29).

What occurred next is also contested. Hughes contends that she was still screaming, the officers were telling her to "shut up," and calling her "bitch." (*Id.*). In her internal affairs complaint, Hughes alleged that the officers told her to "shut up black bitch," and stated "we know you smoke crack." As she relates the incident, Hughes was turned around and "slammed onto the trunk of the car." Depo. I, pp. 62-63). Officer Nichols then sprayed Hughes with OC spray. (Nichols depo., p. 49, Depo. I, pp. 29, 64-68). Hughes contends that during this, Nichols told her to "shut the fuck up." (Depo. I, pp. 67). She then felt a device (a hobble) being placed around her leg and she felt her body being hit. She testified that she did not know what she was being hit with or who was hitting her. She did not know how long it lasted. (Depo. I, p. 68).

- 5 -

The officers do not dispute that force was applied in arresting Hughes. Rather they contend that the force utilized was necessary in response to Hughes' resisting arrest. Officer Kaelin testified that ast they were taking her back from the alley to the police vehicle that Hughes began struggling a little bit and kept moving her hands around her waistband. He claims that when they attempted to place her in the vehicle she began to struggle even more, screaming and yelling and kicking at officers. (Kaelin depo., p. 10).

Carolyn Taylor and Barbara Owens witnessed the use of force against Hughes.

Taylor's kitchen window overlooked the location where the arrest took place. Taylor was able to generally describe the officers, through description of stature and coloring. She described the incident in her statement taken in the internal affairs investigation as follows:

> I had gotten up, getting ready for work, and I heard screaming, a female screamin', and I went to the front window, didn't see anything. Went to the kitchen window, and there I saw about three police cars, a light-colored pickup truck, and I saw two policemen on the back of one of the police cars with a woman, and they were hitting her. She was face down on the trunk of the car and they were hitting her from like around her neck and head. And they were tellin' her to shut up, shut the "F" up as she kept screamin.' And all of a sudden they wrestled her to the passenger side of the car nearest the curb, and I guess they put her in the car 'cause I didn't hear her screamin' anymore.

Taylor Statement, 5/8/01. She stated more specifically that "They were both holding her and one, the bigger one just kept comin' down on, raisin' up, comin' down on her like that. The forearm, um, and they were comin', he, one, he was comin' down on her neck, and her neck and head 'cause she was face down on the trunk of the car..." *Id.* Barbara Owens, whose kitchen window also looked out onto the location of the arrest, apparently did not have as direct a view of the incident, but heard the altercation and had the impression that a high level of violence occurred. She testified, in part,

> I was asleep...I heard a woman screaming...I saw a police car in front of the second police car. 'Cause I thought the woman was sitting in the back seat of the police car in front because that door was open and there was somebody handcuffed in the back and I thought that was her. And she was screaming and so when I got down there looking, I saw a person get thrown on the back of the police car, and I thought it was why she was screaming because she, he was getting beat up. Well, then I saw that it wasn't him it was her because when her shirt went up I saw her bra. And those are

> the two things I remember more than anything else, it was a woman that was getting slammed around and she was scared to death.  I remember her being scared and I thought she was scared that they were going to kill him in the back there, that's why I went down there to look.  And then I remember the shock of seeing that it wasn't him, it was her...Physically, I couldn't see what was going on in the back of the police car because there was a officer on this side and an officer at the end of the police car, she was thrown on the back of the police car...

Owens depo., pp. 21-22.

At some point, Hughes noticed a car approaching and the officers stopped hitting her and they set her up on the trunk of the car.  The officers removed the hobble, and another police vehicle pulled up to the scene.  Hughes contends that when they were asked what was going on, one of the officers responded that they "had another crack head."  (Depo. I, pp. 71-74).

Hughes was placed in the police vehicle and transported to the Fourth District sub-station where she was handcuffed to an iron pole.  (Depo. I, p. 75).  Again, what occurred at the station is contested.  Hughes testified that a female officer, Officer Angela Wiggins, approached her and told her that she "had to search" her.  (Depo. I, pp. 75-76).  Hughes testified that

> So I had one hand in the handcuffs on the rail and the other hand was free.  She proceeded to run her hands up under my bra and checked my bra.  And she was telling me, sweetie, if you just give us the drugs we wouldn't have to do this.  And I was telling her I don't know what you're talking about, you know.  So she proceeded to pull my pants down, and Mr. Pearson was still sitting beside me, and she had me bend over...

Depo. I, p. 76.  Hughes testified that she saw a surveillance camera but that she did not know whether it was on.  *Id*.

Louden transported Hughes to Jefferson County Corrections.  She was released at about 10:30 or 11:00 p.m. when her mother came and picked her up.  (Depo. I, pp. 78-79).  Hughes and her mother then went to University Hospital where, according to the medical records, she was treated for "musculoskeletal pain," "wrist sprain," and "multiple contusions."  Her wrist was placed in a splint, and she was instructed to take Motrin for pain.

Hughes and her mother went to the Fourth District sub-station to file a complaint against the officers. They were directed to Internal Affairs (now the Office of Professional Standards) where Hughes filed an Affidavit of Complaint concerning the arrest on February 2, 2001. Photographs of Hughes were taken and an investigation was commenced. (Depo. I, p. 84). Detective Anthony-Bingham was assigned to investigate the complaint. She attempted to contact Hughes in order to obtain a taped interview, but Hughes refused. The practice in Internal Affairs was that taped interviews were conducted without counsel present. This applied to officers, complainants and witnesses alike. Hughes had pending criminal charges against her and would not give a taped statement. (Anthony-Bingham depo., pp. 58-59; 61; 63-64). Anthony-Bingham conducted a neighborhood canvas and interviewed the police officers involved in the incident. (Anthony-Bingham depo., p. 59).

The matter was reassigned to Lieutenant Toebbe who also attempted to obtain a taped interview from Hughes. Toebbe suggested to Hughes' counsel that she could accompany Hughes to the office and wait in the lobby while Hughes was interviewed, but that she would not be permitted to sit in during the interview. Hughes declined to provide an interview on that basis. Toebbe submitted a written summary of the investigation, dated September 11, 2002, to Major Myra Mason, Commander of the Office of Professional Standards. The twelve-page document summarized Hughes' allegations, interviews which had been conducted, and various other documentation including medical records and photographs. It also listed the dates on which five requests were made to Hughes seeking a taped interview. The report also noted that various verbal requests had been made to Hughes' attorney during court proceedings. All requests were refused. In November of 2002, Chief Smith recommended to the Director of Safety, Milton Dohoney, that the investigation be "closed by exception" because Hughes had not given a taped statement. (Smith depo., pp. 97-98). That recommendation was accepted and the matter was closed.

- 8 -

Hughes was charged with possession of a controlled substance, tampering with physical evidence, possession of drug paraphernalia, and resisting arrest.  (Uniform Citation, dated February 1, 2001).  The charges were dismissed without prejudice in the district court.  Officer Louden explained in his deposition that on the initial court date of March 19, 2001, the drug analysis results had not been returned from the crime lab.  It was common practice at that time for the charges to be dismissed without prejudice, and for a direct indictment to be sought later in the circuit court.  An indictment was returned against Hughes, and she was acquitted in February, 2003 of all charges against her.  (Louden depo., pp. 196-202; March 6, 2003 Letter from Goodwin & Lasch to Hon. David Stengel, et al.)

At the request of Chief White, Captain James Fuchs of the Profession Standards Unit was asked to review the tapes of Hughes' criminal trial and the file on Hughes' complaint.  Fuchs testified that he reviewed all four days of trial testimony and the Internal Affairs file, to see what had been presented at trial, and whether the internal affairs investigation reflected the same information. H concluded that what Internal Affairs had in their file was essentially what had been presented at trial.  Fuchs also reported to his superiors that the case had been "cleared by exception" because Hughes had not given a taped statement.  Fuchs was then directed to send Hughes a letter offering her the opportunity to provide a taped statement.  She was told that if she gave a statement the investigation could be reopened.  Fuchs stated that he did not find anything in his review that warranted reopening the investigation.  He stated that his review of the file did not support that Hughes had been beaten.  (Fuchs depo., pp. 27-29; 51-52; 54-60; 64).  Fuchs sent a letter dated March 28, 2003 requesting that Hughes contact him should she wish to have the investigation reopened.  Hughes did not give a taped statement, as her counsel would not be permitted to be present during the process.  (Fuchs depo., p. 62; April 28, 2003 Letter from Diamond and Norris to Fuchs).

Hughes filed this action on February 1, 2002.

### III.  The Law

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

### A. Excessive Force

The Fourth Amendment prohibits the use of excessive force by arresting and investigating officers.  *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005).  The Supreme Court has held that "all claims that law enforcement officers have used excessive force...in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard..."  *Graham v. Conner*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  The court must "look to the totality of the circumstances to determine whether the force used was reasonable" and also "focus on the very moment the officers make 'split-second judgments'..."  *Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir. 1996)(citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Greenridge v.*

- 10 -

*Ruffin*, 927 F.2d 789 (4ᵗʰ Cir. 1991)).  In evaluating the reasonableness of the force used, the court must examine the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6ᵗʰ Cir. 2001), *quoting, Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

It is clear in the Sixth Circuit that "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff."  *Bruner v. Dunaway*, 684 F.2d 422 (6ᵗʰ Cir. 1982).  "Generally speaking, a police officer who fails to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Smoak v. Hall*, 460 F.3d 768, 784(6ᵗʰ Cir. 2006), *quoting, Turner v. Scott*, 119 F.3d 425, 429 (6ᵗʰ Cir. 1997).[3]

B.  Unreasonable Seizure and Malicious Prosecution under the Fourth Amendment

An arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment.  *Donovan v. Thames*, 105 F.3d 291, 298 n. 7 (6ᵗʰ Cir. 1997).  The contours of the Fourth Amendment in the context of § 1983 have been found to include a separate claim for malicious prosecution.  *Thacker v. City of Columbus*, 328 F.3d 244 (6ᵗʰ Cir. 2003).  "Although this court has yet to resolve the elements of a federal malicious prosecution claim, it is clear that a plaintiff must show, at a minimum, that there was no probable cause to justify [her] arrest and

---

[3]Officer Kaelin was not identified as one of the officers who restrained, struck, or maced Hughes Rather Hughes alleges that Kaelin failed to intervene to stop the alleged use of excessive force.  Kaelin urges that this argument should not be considered by the court as this theory was not specifically pled.  The court concludes, however, that there were sufficient facts recited in the complaint to put Kaelin on notice that his presence and participation, whether active or passive, in the stop and arrest of Hughes is alleged to have been wrongful.  We do not address whether the plaintiff can prove such a claim.  We decide here only that this Fourth Amendment theory has been sufficiently pled to overcome the challenge of lack of notice.

- 11 -

prosecution." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006), *quoting, Thacker,* 328 F.3d at 259.

*Barnes* involved an arrest *after* the return of an indictment allegedly obtained with false testimony. As Hughes was arrested and later indicted, the analysis in *Barnes* does not apply to the case at bar, to the extent that *Barnes* holds that the return of an indictment by a properly constituted grand jury is conclusive on the question of probable cause. *See, Radvansky v. City of Olmstead Falls*, 395 F.3d 291 (6th Cir. 2005).[4]

## C. Qualified Immunity

Qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As noted in *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006),

> In determining whether a law enforcement officer is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: "(1) whether, considering the allegations in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established," *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005)(citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001))." The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151...A right is "clearly established" for qualified immunity purposes when the contours of the right are sufficiently clear, even if the specific action in question has never been held unlawful. *See, Sample*, 409 F.3d at 698. The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. at 202, 121 S.Ct. 2151.

*Smoak*, 460 F.3d at 777-78.

---

[4]The factual basis for the Fourth Amendment unlawful seizure and malicious prosecution claims, the First Amendment retaliation claim, as well as the state law claims for false arrest/false imprisonment, and malicious prosecution is the allegation of fabrication of evidence. This contention is discussed later in this opinion.

Entitlement to qualified immunity is suggested only with respect to the excessive force and strip search claims.[5]  With regard to qualified immunity in the context of an alleged use of excessive force in effectuating an arrest, a plaintiff's resistence is often what triggers a use of force from officers.  *Smoak*, 460 F.3d at 783.  The court must take the facts in the light most favorable to the plaintiff in order to evaluate whether the law concerning the particular application of force was so clearly established that a reasonable officer in the defendants' position would know that his conduct violated the plaintiff's rights.  *See, Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996); *Sova v. City of Mount Pleasoant*, 142 F.3d 898, 902 (6th Cir. 1998).  The parties do not dispute that a genuine issue of material fact exists with respect to the facts surrounding the arrest of Hughes. Taking the facts as alleged, as we are required to do for this purpose, we are faced with a compliant albeit frightened plaintiff who was handcuffed and in the presence of three officers.  The caselaw addressing such a scenario makes clear that physical force such as was alleged (ie. "slamming" the suspect on the trunk of a police cruiser, macing her, striking her, and restraining her leg with a hobble) would be excessive and unconstitutional.  *See, Smoak, supra.* and cases cited therein; *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir.), *cert. denied*, ___U.S.___, 125 S.Ct. 1837, 161 L.Ed.2d 725 (2005)(use of chemical spray on suspect already handcuffed and no longer poses a threat constitutes excessive force); *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)(use of mace on compliant suspect is constitutionally unreasonable).

With respect to the claim of qualified immunity by Wiggins as to the strip search of Hughes in the presence of a male arrestee, this court recently held that officers who carried out non-private strip searched of inmates housed at the Jefferson County Corrections Department were entitled to

---

[5]Smith claims entitlement to qualified immunity generally.  However, the claims against Smith in his individual capacity will be dismissed.  Smith allegedly failed to have Hughes' complaint adequately investigated and employed a procedure requiring taped statements to be given without the presence of counsel) which chilled Hughes' First Amendment rights.  We find that these claims fail as a matter of law.  Therefore, his claim of qualified immunity falls away.  Smith can have no *respondeat superior* liability for the conduct of individual officers under his command.  Rather such claims are claims against the City for alleged unconstitutional policies or practices.  *Cherrington v. Skeeter*, 344 F.3d 631, 645-46 (6th Cir. 2003).

qualified immunity, as the asserted right to discretion and privacy was not clearly established under

Sixth Circuit law at the time of the incident in question, October 5, 2001.  This court stated:

> Although the plaintiffs argue that the right not to be strip searched in full view of
> other inmates and officers was clearly established on October 5, 2001, we disagree,
> and will therefore grant summary judgment in favor of Young on all section 1983
> claims brought against him.  The Sixth Circuit has held:

> For a right to be clearly established, 'the contours of the right must be sufficiently
> clear that a reasonable official would understand that what he is doing violates that
> right.'  Although it need not be the case that 'the very action in question has been
> previously held unlawful,...in light of the pre-existing law the unlawfulness must be
> apparent.'  *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)(citations omitted).
> When determining if a right is clearly established a court should "look first to
> decisions of the Supreme Court, then to decisions of [the Sixth Circuit], and finally
> to decisions of other circuits."  *Masters v. Crouch*, 872 F.2d 1248, 1251-1252 (6th
> Cir. 1989).

*Booker v. Horton*, 2005 WL 1862083 (W.D.Ky., Simpson, J. August 2, 2005) at *2.  The court

discussed *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)[6] and other Sixth

Circuit authority in finding that the caselaw did not articulate a constitutional right to be free from

strip searches viewed by other inmates or officers.  *Booker*, at *2 and *3.("Although *Dufrin,

Masters, and Dobrowolskyj* discuss the place in which a prisoner's strip search was conducted, it

cannot be said to clearly establish a right to be strip searched in private.") The court further held that

citations to authority from another circuit[7] "must point unmistakably to the unconstitutionality of

the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave

no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional

grounds, would be found wanting.  *Virgili v. Gilbert*, 272 F.3d 391, 393 (6th Cir. 2001)."  *Id.*  The

court has been shown no authority calling our holding in *Booker* into question.[8]

---

[6]Relied upon by the plaintiff herein.

[7]Here, plaintiff cites a number of decisions from other federal district courts.

[8]The foreign authority cited by plaintiff does not address the question of the location of a strip search of arrestees accused
of drug crimes who are being booked into a prison population, as was Hughes.

Additionally, state and federal qualified immunity analysis is essentially identical. *Jefferson County Fiscal Court v. Peerce*, 132 S.W.2d 824, 837 (Ky. 2004). Thus our analysis with respect to the excessive force claim under federal law would apply to our qualified immunity analysis as to the state law claim for assault and battery. It is clearly established under Kentucky law that a police officer may use only so much force as is necessary to protect himself, or is necessary or reasonably appears to him to be necessary to take into custody the individual he is seeking to arrest. *City of Lexington v. Gray*, 499 S.W.2d 72 (Ky.App. 1973); KRS 431.025(3).

## D. Municipal Liability

A municipality cannot be held vicariously liable under § 1983 for the acts of its employees or agents. *Monnell v. Department of Social Services of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978).

> [M]unicipal liability attaches only where a constitutional violation results from the "execution of a government's policy or custom." *Gregory [v. Shelby County*, 220 F.3d 433,] 441 [(6th Cir. 2000).] Beyond having to identify "conduct properly attributable to the municipality" itself, a plaintiff "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); *see also, City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989)("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between municipal policy or custom and the alleged constitutional deprivation.").

*Cherrington v. Skeeter*, 344 F.3d 631, 645-46 (6th Cir. 2003). When a city official is sued in his official capacity, it is considered to be an action against the city itself. *See, Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

Also, under Kentucky law, a municipality may be held liable for the actions of a police officer in making an unnecessary assault upon an individual in carrying out an arrest under a

*respondeat superior* theory.  *City of Lexington v. Yank*, 431 S.W.2d 892 (Ky.App. 1968); *Lamar D. v. Beymer*, 2005 WL 2463178 (W.D.Ky. Oct. 4, 2005)( *citing, Yank, supra.*).

### E.  42 U.S.C. § 1985

In order to establish a conspiracy by the defendants to deprive her of the equal protection of the laws, Hughes must prove (1) a conspiracy involving two or more persons (2) for the purpose of depriving her, directly or indirectly, of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.  *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998), *quoting, Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994), *cert. denied*, 514 U.S. 1066, 115 S.Ct. 1698, 131 L.Ed.2d 560 (1995).  Hughes must also establish that the conspiracy was motivated by a class based animus, such as race.  *Id.*; *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996), *cert. denied*, 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997).

### F.  First Amendment Retaliation

In *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006), the Sixth Circuit Court of Appeals noted

As a general principle, "[t]here can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment. *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001).

*Barnes*, 449 F.3d at 717.  The Sixth Circuit went on to find, however, that the recent case of *Hartman v. Moore*, ___U.S. ___, 126 S.Ct. 1695, ___L.Ed.2d ))) (2006) required a modification in the prior Sixth Circuit holdings in *McCurdy*[9] and *Greene*[10] to require a showing of a lack of probable cause in order to establish the requisite causation for such a claim.  *Hartman*, 126 S.Ct. at 1707.

---

[9]*v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001).

[10]*v. Barber*, 310 F.3d 889 (6th Cir. 2002).

G.  Assault and Battery

Under Kentucky law, a police officer may use such force as is necessary to protect himself, or is necessary or reasonably appears to him to be necessary to take into custody the individual he is seeking to arrest.  *City of Lexington v. Gray*, 499 S.W.2d 72 (Ky.App. 1973), *citing, Maggard v. Commonwealth*, 22 S.W.2d 298 (Ky. 1929); KRS 431.025(3).   The burden of establishing justification is on the officer who must show that he had reasonable grounds to believe and in good faith did believe that the arrestee had committed a felony, or had committed a misdemeanor in his presence, and that he used no more force than was reasonably necessary, or so appeared to him in the exercise of reasonable judgment, in order to effect the arrest.  *City of Lexington v. Gray*, 499 S.W.2d at 74, *citing, Goins v. Hudson*, 55 S.W.2d 388 (Ky. 1932).

H.  False Arrest and False Imprisonment under Kentucky Law

Hughes has alleged the state law claims of false arrest and false imprisonment.  (Count VII). In instances involving law enforcement officers there is no distinction between false arrest and false imprisonment.  *Lexington-Fayette Urban County Government v. Middleton*, 555 S.W.2d 613, 619 (Ky.App. 1977).  False imprisonment is always the result of a false arrest, since the individual is placed under the restraint by the false arrest and there can be no imprisonment without arrest by a peace officer. *Id.*  The law with respect to false arrest or false imprisonment is to some extent coextensive with the law concerning assault and battery by a police officer.  The analysis is centered around the grounds for arrest and the use of force in effectuating that arrest.  The court in *Middleton, supra.*, quoted *City of Lexington v. Gray, supra.* and *Goins v. Hudson, supra.* in discussing the standard of proof for false arrest or false imprisonment.  The court held that

> ...[O]nce the plaintiff meets his burden and establishes his case, if the defendant attempts justification of his conduct, then the burden does shift to him to establish *both* that he had reasonable grounds and in good faith did believe those grounds for making the arrest *and* that he used no more force than necessary.  The absence of either of these, not both, will make him liable in an action for false arrest and

- 17 -

> imprisonment and any resulting injury therefrom.  In other words, if the officer did
> have reasonable grounds for making the arrest but used more force than necessary
> he would be liable and, if he only used necessary force in effecting the arrest but
> there were, in fact, no reasonable grounds for the arrest, he will also be liable.

*Middleton*, 555 S.W.2d at 617-18.


I.  Malicious Prosecution under Kentucky Law

A claim for malicious prosecution under Kentucky law requires proof of (1) the institution

or continuation of original judicial proceedings, (2) by, or at the instance of the defendant, (3)

termination of such proceedings in favor of the plaintiff, (4) malice in the institution of the

proceedings, (5) lack of probable cause for the proceedings, and (6) damages as a result of the

proceedings.  *Farmers Deposit Bank v. Ripato*, 760 S.W.2d 396 (Ky. 1988), *citing, Raine v. Drasin*,

621 S.W.2d 898 (Ky. 1981).

The Sixth Circuit has held that actors "cannot be held liable for malicious prosecution when

[they] did not make the decision to prosecute" the plaintiff.  *See, Skousen v. Brighton High School*,

305 F.3d 520, 529 (6th Cir. 2002); *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005).


III. Analysis

Kaelin seeks summary judgment on the Fourth Amendment excessive force claim on the

ground that Hughes has no evidence that he personally committed any of the acts which she claims

were excessive in effectuating the arrest.  However, Kaelin may be held liable for failing to prevent

the use of excessive force if he observed or had reason to know that excessive force was being used

and had the opportunity and means to prevent the harm.  *Smoak v. Hall, supra.; Bruner v. Dunaway,

supra.*

The court concludes that a genuine issue of material fact exists concerning whether Officer

Kaelin saw and had the opportunity to prevent the alleged harm to Hughes.  He was one of three

officers on the scene and was, in fact, the officer who initiated the stop of Pearson's vehicle. He was involved in the initial encounter when Pearson and Hughes exited Pearson's truck. While Kaelin claims to have been occupied in securing Pearson in the police vehicle, he was not removed a great distance or for an extended period of time from the activity in question. It is undisputed that Hughes was screaming loudly and consistently enough to wake neighbors in their homes. A reasonable jury could find that activity such as screaming and the ensuing scuffle which occurred in close proximity would have gotten the attention of Kaelin. A question of fact exists therefore whether Kaelin's involvement at least in the initial stop and investigation, and his close proximity to events occurring during the arrest of Hughes gave rise to a duty on his part to intervene to prevent harm to Hughes. Summary judgment must therefore be denied as to Kaelin on the claim for excessive force under the Fourth Amendment.

As noted herein, Kaelin has moved for summary judgment on all of the claims against him. He has not separately discussed Count VI for assault and battery in his memorandum. Hughes also does not discuss the viability of this claim as against Kaelin.

It appears, however, that there is no evidence establishing that Kaelin committed assault and battery upon Hughes. The witnesses identified officers Louden and Nichols as the two officers involved in the arrest of Hughes. Summary judgment will be denied on the claim of excessive force as against officer Kaelin on the ground that a question of fact exists concerning whether, under the circumstances, he had any duty to intervene to prevent a use of excessive force by his fellow officers. Reason dictates that the same analysis cannot be applied to an assault and battery claim under common law. Under Kentucky law, the force permitted to be employed by an officer to effectuate an arrest must be shown to be justified under the circumstances. *City of Lexington v. Gray, supra.* The officer must establish that it was reasonable to believe, and that he in good faith did believe, that the force used was reasonably necessary to effectuate the arrest or to defend himself. *Id.* Justification of force requires a showing of necessity by the officer who employs the force.

Therefore, the element of good faith belief could not by anyone other than the officer who effectuated the arrest. The court cannot envision how an officer who has not himself been shown to have been actively involved can be held liable for an assault and battery under state law. The state law claim for assault and battery against Officer Kaelin will be dismissed.

The court concludes on the authority discussed herein that officers Louden, Nichols, and Kaelin are not entitled to qualified immunity with respect to the Fourth Amendment claim for excessive force. Under the facts adduced, taken in the light most favorable to the plaintiff, the law concerning the application of force under the circumstances in question was so clearly established that a reasonable officer in the defendants' position would have known that his conduct violated the plaintiff's rights. *See, Dickerson v. McClellan, supra.; Sova v. City of Mount Pleasant, supra.* As the issue has been framed, a handcuffed, compliant but frightened Hughes was "slammed" on the trunk of a police vehicle, maced, stricken, and restrained with a hobble. Such an application of force by two officers to effectuate the arrest of an handcuffed and compliant, albeit screaming, arrestee would clearly be excessive. *Smoak, supra.; Champion, supra.; Adams, supra.* Thus the defendants would have been aware that the application of this degree of force was unconstitutional. Qualified immunity will be denied as to this claim.

Under the same analysis, qualified immunity is denied to officers Louden and Nichols as to the state law claim for assault and battery. State and federal qualified immunity analysis is essentially identical. *See, Jefferson County Fiscal Court v. Peerce, supra.* Kentucky law clearly established that a police officer may only use such force as is necessary to protect himself, or is necessary or reasonably appears to him to be necessary to take into custody the individual he is seeking to arrest. *City of Lexington v. Gray, supra.* Qualified immunity will be denied as to the assault and battery claim.

The Fourth Amendment claim alleging an unconstitutional strip search (Count IV) names all defendants. It appears, however, that the only defendant involved in the search of Hughes was

Officer Wiggins.  As noted in *Smoak v. Hall*, 460 F.3d at 785, "We have found no cases in this circuit where a nonsupervisory officer who was not present at the scene or did not actively participate in a constitutional deprivation was held liable for the failure to prevent the constitutional violation from occurring."  In any event, we conclude that the caselaw did not clearly articulate a constitutional right to be free from strip searches viewed by other inmates or officers.  *See, Booker, supra.* and cases cited therein, and therefore a reasonable officer under the circumstances would not be charged with understanding that what she was doing violated the plaintiff's rights.  We conclude that the defendants are entitled to qualified immunity as to this claim.

Hughes claims that she was arrested without probable cause because she did not possess crack cocaine or drug paraphernalia.  She further contends that she did not resist when the officers arrested her.  She testified that she did not see any drugs or drug paraphernalia in Pearson's vehicle. The complaint does not contain any allegation that the officers planted or fabricated crack rock, pipes and a crack spoon in order to charge Hughes with a drug offense.  Rather the complaint simply alleges in various places and under various counts that the officers lacked probable cause to arrest her.

The court is urged to find that a reasonable inference of fabrication of evidence may be drawn from the fact that (1) Hughes testified that the drugs were not hers, (2) Hughes testified that she did not see any drugs in the vehicle and therefore did not believe that the drugs were Pearson's, (3) Officer Nichols did not know about any drugs or drug paraphernalia until he was shown the items by Officer Louden at the police station, and (4) Hughes testified that she was not informed of the charges against her at the time of her arrest.  These facts, however, do not give rise to a jury question on this issue.  Denying that the drugs were hers and noting that one officer of three did not see the drugs falls short of suggesting the conclusion that the officers engaged in the manufacture of evidence.  We note that the verified complaint has not been amended to add any factual

- 21 -

allegations supporting a claim of fabrication of evidence.  This matter has been relegated solely to argument in the briefs.  *See, Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997):

> Stemler did not allege [a claim of fabrication of evidence] in her complaint.  The closest she comes to making such an allegation is at paragraph 48 of her amended complaint: "The Defendants, Officers Wince, Dolan, Dusing and City of Florence, instituted and continued the original criminal judicial proceeding against the Plaintiff by insisting upon her prosecution and conviction despite their personal knowledge Plaintiff should not be so prosecuted."  This allegation cannot fairly be read to give notice that she seeks to assert an evidence-tampering claim...Stemler, of course, was free to seek leave to amend her complaint again to raise her new theory of falsification of evidence...She did not do so.  The district court did not err in dismissing Stemler's complaint by failing to consider a cause of action that she had not yet alleged.

"Although Fed.R.Civ.P. 8 does not require detailed factual pleading, a plaintiff's assertions must still direct the defendant to the factual cause of the plaintiff's alleged injury...The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions...devoid of any well-pleaded facts."  *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995), *citing, Baxter v. Vigo County School Corp.*, 26 F.3d 728, 736 (7th Cir. 1994).

At no time has Hughes testified that the officers fabricated drug evidence.  When questioned specifically on this point, Hughes reiterated only that the drugs were not hers.

> Q: In any event, if I'm understanding you, Ms. Hughes, you don't have any evidence that the police conspired to do anything wrongful to you, do you?
>
> A: No.
>
> Q: With regard to the pipe, the crack and the spoon that were found in the truck when it was stopped by the police officers on February 1st, 2001, you don't have any knowledge, evidence or even, as I'm understanding it now, you're not even making an accusation that they fabricated that evidence; is that correct?
>
> A: I don't [sic] the line of questioning, that you're giving me.  Am I saying that they fabricated everything?
>
> Q: Yes.
>
> A: No.  I'm not saying that they fabricated it.

Q: All right.  They didn't plant the evidence in the truck or otherwise make it simply appear that the crack might be yours, did they?

A: I don't know.  It wasn't mine, so I don't know.  You'd have to ask them that.


The fact that Officer Nichols did not know about the drugs found at the scene does not bolster the contention of fabrication.  Nichols was not involved in the original stop of the vehicle and the removal of the occupants from it.  Officer Kaelin who *was* involved in the original stop testified that he also observed a crack rock and drug paraphernalia from his vantage point prior to the arrest.  Additionally, Hughes' stated in her Internal Affairs complaint that the officers accused her of smoking crack and told a supervisory officer who arrived on the scene that they had "another crack head."  These statements would be consistent with the officers having discovered crack and drug paraphernalia in the vehicle.  There is no other testimony offered to support an inference that the drug evidence was fabricated.

Hughes also points to the dismissal of the original charges in the district court and the subsequent pursuit of an indictment in the circuit court by Officer Louden as evidence of false arrest and malicious prosecution.  She contends that probable cause was lacking at the time of her arrest and all subsequent legal action taken against her then constituted malicious prosecution.  She contends that under *Thacker, supra.*, a finding that there was no probable cause  establishes that the prosecution was also unjustified.  (Hughes Combined Brief in Opposition, pp. 30-31).  We have found, however, that Hughes has not come forward with evidence to withstand summary judgment as to the assertion of fabrication of evidence to deny the officers' assertion of probable cause.  Further, Officer Louden testified that the charges were dismissed in the district court as a matter of common practice because the drug analysis results had not come from the lab by that date.  He stated that in a case involving crack cocaine, it was commonplace to seek an indictment in the circuit court.  Hughes has not come forward with any evidence to dispute this testimony.

The defendants contend that the holding in *Barnes v. Wright*, *supra*., renders the above analysis of facts unnecessary, as probable cause cannot be challenged.  They recite the statement in *Barnes* that "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes.* at 716.  This quote is accurate.  However, they misconstrue the context in which this statement was made.  *Barnes* involved an arrest that occurred as a result of the return of an indictment based on allegedly false information.  By contrast, here the arrest occurred first, charges were filed and dismissed without prejudice,  and an indictment was then obtained.  As noted in *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307-08, n. 13 (6th Cir. 2005),

> Appellees argue in their brief that the subsequent indictment of Radvansky by the grand jury conclusively establishes probable cause for arrest.  Appellees' Br. at 20.  In a situation where the arrest of the plaintiff was *pursuant* to a grand jury indictment, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)(quoting, *Ex parte United States*, 287 U.S. 241, 250, 53 S.Ct. 129, 77 L.Ed. 283 (1932)).  By contrast, neither the Supreme Court, nor this court, has ever held that a *subsequent* grand jury indictment can establish probable cause for an earlier arrest.  *See Rios v. United States*, 364 U.S. 253, 261, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960)(evaluating probable cause based on the circumstances at the time of arrest despite the fact that the defendant was later indicted by a federal grand jury); *Giordenello v. United States*, 357 U.S. 480, 487, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958)(holding that in the absence of a prior indictment, probable cause for arrest is determined by the facts in the sworn complaint); *United States v. Bowker*, 372 F.3d 365, 374 (6th Cir. 2004)(analyzing probable cause to arrest based on evidence before the warrant-issuing magistrate judge even though the defendant was later indicted by a grand jury); *United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002), *cert denied*, 537 U.S. 1177, 123 S.Ct. 1005, 154 L.Ed.2d 923 (2003)(assessing the existence of probable cause to arrest a later-indicted defendant based on the facts the police knew at the time of arrest); *see also Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998)(concluding that police had probable cause to arrest the suspect despite the fact that he was not indicted later by a grand jury).  What we have previously held implicitly, we now state explicitly–after-the-fact grand jury involvement cannot serve to validate a prior arrest.  *See Garmon v. Lumpkin County*, 878 F.2d 1406, 1409 (11th Cir. 1989)("A subsequent indictment does not retroactively provide probable cause for an arrest that has already taken place.").

Hughes urges that she may challenge the pursuit of an indictment by Louden by showing that the officers fabricated the drug evidence and therefore probable cause was lacking. She cites *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006); *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001). As previously noted, however, Hughes has failed to present sufficient evidence to establish a jury question on the issue of fabrication.

In sum, an arrest *without probable cause* constitutes an unreasonable seizure in violation of the Fourth Amendment. *Donovan v. Thames*, *supra*. A separate Fourth Amendment claim for malicious prosecution requires, at a minimum, a showing that there was *no probable cause* to justify her arrest and prosecution. *Thacker v. City of Columbus*, *supra*. Malicious prosecution under Kentucky law requires a *lack of probable cause* for the proceeding. *Raine, supra*. A First Amendment retaliation claim requires proof of a *lack of probable cause* for the prosecution. *Hartman, supra*. We conclude, therefore, that since Hughes has failed to establish that a genuine issue of material fact exists with respect to probable cause to arrest and charge Hughes with a drug offense, summary judgment must be granted in favor of the defendants on the claims of Fourth Amendment unreasonable seizure and malicious prosecution,  malicious prosecution under Kentucky law, and First Amendment retaliation.

A genuine issue of material fact exists with respect to the contention that the misdemeanor of resisting arrest occurred in the presence of the officers. This was raised as an alternate justification for Hughes' arrest and prosecution. This factual dispute goes to the heart of the excessive force claim as well as to the issue of probable cause. This question of fact will be an essential one in the jury's determination whether the amount of force employed by the officers was excessive under the circumstances. However, having concluded that the evidence remains unassailed that the officers had probable cause to arrest and charge Hughes with a felony drug crime, the matter of probable cause for the arrest itself is not a question for the jury.

- 25 -

The court will grant summary judgment in favor of the defendants on the claim of conspiracy under 42 U.S.C. § 1985.  In order to establish a claim under this section, Hughes must prove (1) a conspiracy involving two or more persons (2) for the purpose of depriving her, directly or indirectly, of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.  *Smith, supra.*  She must also show that this conspiracy was motivated by a class based animus such as race.  *Id.*

Hughes alleges that the officers, motivated by a race based animus (evidenced by the use of degrading, racist terms such as "nappy headed" and "black bitch"), beat her during the course of arresting her.  She alleges that two officers engaged in the beating while a third officer observed and did not intervene to prevent the abuse.  She alleges that the beating caused her injury for which she sought medical treatment, and for which she sought redress by the filing of an Internal Affairs complaint.

The defendants contend that Hughes made a judicial admission in her 2005 deposition that she was not alleging that her civil rights were violated because the defendants were motivated to discriminate against black people.   In her deposition, she was questioned concerning the construction of the legal claim, and to that end, counsel objected that she was being asked for a legal interpretation.  The court agrees.  The pertinent testimony was that

> Q: Now, in this case you have alleged that the defendants conspired to deprive you of your civil rights because they were motivated by race to discriminate against black people and in your case to charge you with a crime they knew you did not commit and then to plant evidence in support of that charge; is that correct?
>
> A: No.
>
> Q: That's not what you're claiming in this case?
>
> A: No.
>
> Q: What are you claiming in this case?

- 26 -

A: I'm claiming that my civil rights were violated when they pulled me over, but I'm not claiming that they conspired–

Q: All right.

A:–against black people.

Q: You're not?

A: No, I'm not.

Q: Okay. Let me just refer to you part of your complaint from paragraph 29 that says, Defendants acted in furtherance of a conspiracy to deprive plaintiff of her civil rights, did act in concert pursuant to their policy and practice to deprive people of color of their rights and privileges. You're not aware of the fact that that's part of your allegation set forth in paragraph 39 (sic) of your complaint?

A: I probably says the things like that but I didn't–no. I can't explain. I don't know.

Q: All right.

A: I don't know.

Hughes Depo. II, pp. 18-20.

The deposition testimony discussed the claims, not the events which she alleges occurred. Hughes alleged in her Internal Affairs complaint that raced-based epithets were directed at her. She alleged that three officers were involved in arresting her, that they employed excessive force, injuring her, and called her "nappy headed" and "black bitch." The only deposition question addressing the *facts* was the single follow-up question to the previous exchange in Hughes' 2005 deposition:

Q: In any event, if I'm understanding you, Ms. Hughes, you don't have any evidence that the police conspired to do anything wrongful to you, do you?

A: No.

Hughes Depo. II, pp. 20. It is unclear to the court from this single question and answer whether or not Hughes intended to admit that she could adduce no facts to support her claim. We conclude, however, that she indeed has not adduced facts in response to the motions for summary judgment which support the existence of a plan among the officers involved in her arrest.

- 27 -

We note that a conspiracy need not be express in order to constitute the necessary agreement.

*Collyer v. Darling*, *supra*. at 229:

> A civil conspiracy is an agreement between two or more persons to injure another
> by unlawful action.  Express agreement among all the conspirators is not necessary
> to find the existence of a civil conspiracy.  Each conspirator need not have known
> all of the details of the illegal plan or all of the participants involved.  All that must
> be shown is that there was a single plan, that the alleged coconspirator shared in the
> general conspiratorial objective, and that an overt act was committed in furtherance
> of the conspiracy that caused injury to the complainant.

However, it must be shown that there was a single plan.  There is a complete absence of any such evidence.  Hughes discusses at length the fact that Chief White and Captain Reed of the Louisville Metro Police Department find the use of racially-charged remarks wholly inappropriate and unprofessional.  She also refers to expert witness Lou Reiter's testimony that police officers often " prey on 'marginalized' persons."  She notes that the West End of Louisville has a higher share of violent crime and drug use due to an "imbalance in socio-economics."  (Combined Brief in Opposition, pp. 40-42).  These observations concerning the professional challenges faced by law enforcement in a community fraught with societal ills simply do not speak to the matter of proving that a plan existed on the morning in question to violate the plaintiff's constitutional rights.

We find *Smith, supra*. instructive on this point.  In that case, a struggle ensued during an encounter with police in a high crime area of Knoxville, Tennessee.  A number of officers hit the plaintiff, a black man, on the back and shoulders with billy clubs and flashlights while shouting racial epithets at him.  He was eventually arrested and charged with assaulting a police officer, a charge which was later dropped.  In affirming the dismissal of the plaintiff's 1985 claim, the court stated:

> [F]or purposes of this motion we assume that racial epithets were uttered at plaintiff
> by someone after he grabbed Officer Thornburg, we nevertheless conclude that there
> is a noticeable absence of any evidence of a *conspiracy* to deprive plaintiff of his
> constitutional rights.  Plaintiff has introduced no evidence that defendants acted in
> concert or in furtherance of a common objective.  In fact, the circumstances evince
> an occurrence of events much too quick to suggest that a conspiracy to deprive the

> plaintiff of his constitutional rights on the basis of his race was orchestrated.
> Officers did not even know the identity or race of the plaintiff until after Thornburg
> had entered the vehicle and after Thornburg was assaulted by plaintiff.   In the
> absence of any evidence that the defendants agreed to deprive plaintiff of his
> constitutional rights, we conclude that the District Court properly granted summary
> judgment on behalf of the defendants on plaintiff's § 1985(3) claim.

*Smith, supra.* at 1078.  We conclude, taking the facts in the light most favorable to Hughes, that she has failed to come forward with evidence to establish a genuine issue of material fact concerning her allegation of the existence of a race-based conspiracy.  The defendants are entitled to judgment as a matter of law on this claim.

Hughes can succeed on her claims against the City under § 1983 only if she establishes that a constitutional violation resulted from the execution of a City policy or custom.  She must show that deliberate conduct of the City was the moving force behind her alleged injury.  *Cherrington v. Skeeter*, *supra.*

In her complaint Hughes recites generalized duties owed by the City in maintaining its police force.  She has not, however, offered any specific facts to establish that a policy or custom, practice or attitude of the police department resulted in the alleged beating of Hughes.  Hughes contends that the after-the-fact actions in allegedly "maintaining a code of silence" and purportedly failing to adequately investigate complaints of misconduct foster the kind of unconstitutional acts allegedly engaged in by these officers.  These allegations fail to establish the necessary direct causal link between the municipal action and the deprivation of rights.  *See, Cherrington, supra.*

Further, the particular facts alleged concerning the perceived problems with the internal affairs investigation amount to nothing more than a desire for a different result.  Hughes has not shown that she was entitled to a different or more complete investigation.  Nor has she shown that she had a right to provide a taped statement to the department with her attorney present.  She has not shown the investigation to have been inadequate.  Rather, she received a second review of her complaint with the benefit of a full trial transcript after her acquittal on the criminal charges.  She

has failed to show that this was constitutionally inadequate review.  Further, as the allegation of fabrication of evidence has been found to be insufficient, her claim for First Amendment retaliation for having filed an Internal Affairs complaint fails.  As noted earlier in this opinion, she must prove lack of probable cause for the filing of the charges in order to succeed on a First Amendment retaliation claim.  *Hartman, supra.*

To defeat a motion for summary judgment, Hughes cannot merely rely upon conclusory allegations, but must come forward with "concrete evidence supporting [her] claims and establishing the existence of a genuine issue of fact."  *Cloverdale Equipment Company v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989), *citing, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).   With respect to claims of failure on the part of the City to adequately train or supervise its officers, there must be proof adduced of "deliberate indifference." That is, there must be proof that the City took a "course of action" in this regard "consciously chosen from among various alternatives" to utilize programs which evidence deliberate indifference to the rights of citizens.  She may not simply claim that better or different training or supervision could have prevented the incident in question.  *City of Canton v. Harris,* 489 U.S. 378 (1989)*Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985); *Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998); *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994). Plaintiff has wholly failed to meet this exacting standard.  For these reasons, the claims against the City under § 1983 will be dismissed.

A separate order will be entered this date in accordance with this opinion.